IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


J. LILLY, LLC, an Oregon Limited Liability
Company,                                                    No. 3:18-cv-01104-HZ

                        Plaintiff,                          OPINION & ORDER

        v.

CLEARSPAN FABRIC STRUCTURES
INTERNATIONAL, INC., a Connecticut
Corporation; and STORM CONSTRUCTION,
LLC, a Michigan Limited Liability Company,

                        Defendants.


Joshua S. DeCristo
Kaitlyn M. Dent
Emerge Law Group
621 SW Morrison Street, Suite 900
Portland, OR 97205

        Attorneys for Plaintiff

Ronald J. Clark
Peder A. Rigsby
Anna Lasher
Bullivant Houser Bailey, P.C.
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204

 Attorneys for Defendant/Counter Plaintiff Clearspan Fabric Structures

Rudy R. Lachenmeier
Lachenmeier Enloe Rall & Heinson
9600 SW Capitol Highway
Portland, OR 97219

 Attorney for Defendant Storm Construction

Joshua S. DeCristo
JDC Law, LLC
P.O. Box 28385
Portland, OR 97228

 Attorney for Counter Defendants Powell and Mahalo, Inc.

HERNÁNDEZ, District Judge:

 Defendant Clearspan moves for partial summary judgment to enforce a consequential damages waiver provision of one of the parties' contracts and to dismiss Plaintiff's claim of lost profits in this claim for breach of contract, breach of warranty, and negligence arising from the Plaintiff's lease of a commercial greenhouse from Clearspan. For the reasons explained in this opinion, the Court grants Clearspan's motion.

## BACKGROUND

 Plaintiff J. Lilly has a license from the state of Oregon to grow commercial marijuana. Not. Remov. Ex. A, ¶ 1, ECF 1-1 ("Compl."). When J. Lilly's owner, Frankie Powell, started J. Lilly, she owned a cannabis dispensary that she opened in 2015. Def. Mot. Part. Sum. J. ("Def. Mot."), Rigsby Decl. Ex. 1 ("Powell Dep.") 18:9-23, ECF 44-1. Powell had no experience

growing commercial marijuana. Powell Dep. 18:24-19:1. Powell formed J. Lilly because she wanted to grow cannabis to sell to her dispensary and to other dispensaries in Oregon. Powell Dep. 28:10-17. In January 2016, J. Lilly leased property in Washington County for the business. Compl. ¶ 5.

J. Lilly signed an equipment lease agreement with a purchase option (the "lease") that provided that Clearspan would lease J. Lilly a large greenhouse in exchange for $287,199.84. Rigsby Decl. Ex. 3 ("lease" or "lease agreement") at 10, ECF 44-3. The purchase option would allow Plaintiff to purchase the greenhouse for $100.00 at the end of the sixteen-month lease term. *Id*. at 10. The lease agreement provided that Plaintiff was "solely and exclusively responsible for the assembly of the equipment." *Id.* at 3. The lease contained an integration clause that said that "[t]his Agreement, Exhibit 1 and Schedule A constitutes the entire agreement of the Lessor and the Lessee with respect to the lease of the Equipment . . . provided, however, that any written agreement to which the Lessor and the Lessee may be a party concerning the design and/or construction of the Equipment shall be unaffected hereby and shall continue in full force and effect." *Id*. at 8.

In a separate agreement (the "construction contract"), Clearspan agreed to deliver and install the greenhouse for a price of $278,045.13, with $75,000 due before shipping, and the balance due "in consecutive monthly lease payments which sum shall be due and payable by [Plaintiff] not later than thirty (30) days after Clearspan's issuance of an invoice for the same." Rigsby Decl. Ex 4 ("construction contract") ¶¶ 1.1.2, 2.1.2, 6.2, ECF 44-4. Section 2.2 of the construction contract provided that "[a]ll products, equipment, systems or materials incorporated in the Work that are purchased by the Lessee from Clearspan shall be covered exclusively by the warranty attached hereto as Exhibit B." *Id*. The construction contract—at least the portion of it

that is in the summary judgment record—has two exhibits: "Exhibit A," which includes a "Construction Form" and "Design Documents," Rigsby Decl. Ex. 4 at 10-37, and "Exhibit C," which includes documents entitled "ClearSpan Fabric Structures Installation Warranty" and "Manufacturer's Product Warranty for Class IV Structure." *Id*. at 38-45.

Clearspan subcontracted Storm Construction to construct the greenhouse. Compl. ¶ 13. Storm Construction performed the work between June 2016 and August 2016. *Id*. at ¶ 14. Plaintiff alleges that the construction was not performed in a workmanlike manner or in accordance with the plans and specifications and, as a result, the greenhouse had several leaks, holes in the roof that interfered with fan system air flow, a broken weld on a pipe, and other defects. *Id*. at ¶¶ 15-16. Because of those defects, Plaintiff could not begin growing cannabis in the fall of 2017, as it had intended. *Id*. at ¶¶ 17, 20.

In November 2017, Clearspan sent Storm Construction to fix one defect that Plaintiff had identified (the broken weld), but Clearspan did not ask Storm Construction to repair any of the other defects. *Id*. at ¶ 22. Plaintiff alleges that because of the remaining defects, the greenhouse was unsuitable for growing cannabis, and it was never able to begin a cannabis crop, which caused a loss of $5,400,000 in profits. *Id*. at ¶ 25. Plaintiff brings claims of breach of contract and breach of warranty against Clearspan, *id*. at ¶¶ 27-48, and a negligence claim against Storm Construction, *id*. at ¶¶ 49-50.

Plaintiff's First Claim for Relief seeks rescission of "the contract"[1] and restitution in the amount of $188,000. *Id*. at ¶ 31. Plaintiff's Second Claim for Relief seeks damages resulting from Defendants' breach of "the contract," including the cost to repair or replace the greenhouse

---

[1] It is not clear from Plaintiff's Complaint which contract it refers to in its First and Second Claims for Relief because Plaintiff refers to "the contract" in both claims, despite the existence of two contracts.

or the reduced value of the defective greenhouse, not to exceed $288,045.13, plus lost profits from both defendants in the amount of $5,400,000. *Id*. at ¶¶ 36, 50. Clearspan asserted counterclaims for breach of the lease, unjust enrichment, conversion, and replevin and brought third party claims against Frankie Powell and Mahalo, Inc. for breach of guaranty. Def. Clearspan's Answer at ¶¶ 60-86, ECF 27.

Clearspan moves for partial summary judgment on Plaintiff's claim for lost profits on two grounds. First, Clearspan seeks to enforce paragraph 7.4 of the construction contract to bar Plaintiff's lost profits claim. Def. Mot. 5-9. Section 7.4 of the construction contract reads:

> **7.4     Mutual Waiver of Consequential Damages.** The Lessee agrees to waive all claims against Clearspan for all consequential damages that may arise out of or relate to this Agreement including but not limited to the Lessee's loss of use of the property, all rental expenses incurred, loss of services of employees, or loss of reputation. Clearspan agrees to waive all claims against the Lessee for all consequential damages, other than loss of profits related to the Project, that may arise out of or relate to this Agreement including but not limited to the loss of business, loss of financing, principal office overhead, or loss of reputation. The provisions of this Section shall survive any termination of this Agreement.

Rigsby Decl. Ex. 4 at 6, ¶ 7.4. As an alternative ground for dismissing Plaintiff's lost profits claim, Clearspan argues that the evidence that Plaintiff produced in support of that claim is too indefinite and would require the jury to speculate. Def. Mot. 10-16. The Court agrees that Plaintiff is precluded from claiming damages for its lost profits on both of those grounds. At oral argument, the Court raised the issue of whether a federal court sitting in diversity can award Plaintiff damages for the loss of profits derived from the cultivation and sale of marijuana and received supplemental briefing from the parties addressing that question. The Court finds that it cannot award Plaintiff damages for lost profits from the sale of marijuana and dismisses Plaintiff's lost profits claim on that additional basis.

///

///

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the Court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

///

///

**DISCUSSION**

**I.      Consequential Damages Waiver**

Clearspan argues that the construction contract's waiver of consequential damages precludes Plaintiff's lost profits claim.  In response, Plaintiff argues that the consequential damages waiver provision is unenforceable because it is unconscionable and because it is a limited remedy that fails of its essential purpose under the Oregon Uniform Commercial Code ("U.C.C.").

**A.      Applicable Law**

Both parties' arguments about the enforceability of the waiver provision rely on various provisions of the U.C.C.  Clearspan moves only to enforce a provision of the construction contract, which is a contract for services.  At oral argument, the parties agreed that the U.C.C. does not apply, but asserted that it provides the basis for the analysis.  The construction contract required Clearspan to deliver and construct the greenhouse.  Rigsby Decl. Ex. 4 at 2, ¶¶ 1.1.2 ("The Project means the erection at the Worksite of the Clearspan products listed on the attached Exhibit A."), 1.1.4 ("The Work is the Construction Services provided in accordance with Section 2.1.2"), 2.1.2 ("Clearspan shall provide all construction supervision, inspection, construction equipment, labor, materials and tools necessary to complete the Work (the 'Construction Services')."  In contrast, the lease appears to govern the sale of the greenhouse structure to Plaintiff.  Rigsby Decl. Ex. 3 at 1-2, ¶¶ 1(a) ("Lessee agrees to lease from Lessor, the equipment described in the attached Exhibit 1 (the 'Equipment')," 5(a) ("Except as may be otherwise expressly provided in a separate written agreement to which the Lessor and the Lessee are a party, the Lessee shall be solely and exclusively responsible for the assembly of the Equipment.").  Contrary to Plaintiff's assertion at oral argument, the lease and construction

contract do not incorporate one another by reference. Both contracts have integration clauses that reflect that each contract operates independently from the other. Rigsby Decl. Ex. 3 at 8, ¶ (e) ("any written agreement to which the Lessor and the Lessee may be a party concerning the design and/or construction of the Equipment shall be unaffected hereby and shall continue in full force and effect."); Rigsby Decl. Ex. 4 at 8, ¶ 10.1.1 ("any written agreement to which Clearspan and the Lessee may be a party concerning the leasing or rental of the Project shall be unaffected hereby and shall continue in full force and effect.").

The construction contract is a contract for services to which the U.C.C. does not apply. Or. Rev. Stat. § ("O.R.S.") 72.1020 ("this chapter applies to transactions in goods"); *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (in general, when the sale of a good predominates the essence of a contract and services provided are merely incidental to the sale of the good, the U.C.C. applies); *Quantum, Inc. v. Akeso Health Sciences, LLC*, No. 3:16-cv-00334-JE, 2017 WL 2434301, at *10 (D. Or. Jun. 5, 2017) (holding that U.C.C. statute of limitations did not apply because distribution contract was a contract for services); *Platt Elec. Supply, Inc. v. Menlo Logistics, Inc.*, No. Civ. 00-474-AS, 2002 WL 31466490, at *3 (D. Or. Mar. 19, 2002) (when services predominate in the agreement, the U.C.C. does not govern the interpretation of its terms). Oregon courts look to the U.C.C. for guidance in limited circumstances when interpreting contracts for services. *See*, *e.g.*, *Illingworth v. Bushong*, 297 Or. 675, 692-93 (1984) (noting that "the legislature's choice, by its terms, applies [Article 2 of the U.C.C.] only to contracts for the sale of goods," but using the U.C.C. provisions as "the initial point of departure" for analyzing a liquidated damages provision), *abrogated on other grounds by Ditommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 309 Or. 190, 198 (1990).

Oregon courts apply common law principles when analyzing construction contracts. *See*, *e.g.*, *Portland ex rel. Donohue & Fleskes Corp. v. Hoffman Constr.*, 286 Or. 789, 791, 802-03 (1979) (applying common law principles to general contractor's subcontract for construction of sewage treatment facilities); *Adair Homes, Inc. v. Jarrell*, 59 Or. App. 80, 84-85 (1982) (applying common law principles to analyze formation of a construction contract); *Brown v. D2S Res., Inc.*, 61 Or. App. 8, 12-14 (1982) (applying common law principles to determine whether non-breaching party was entitled to damages for the cost to repair substandard work completed under a construction contract). *See also Sponseller v. Meltebeke*, 280 Or. 361, 365-66 (1977) (holding that U.C.C. breach of warranty statute of limitations does not apply to construction defect claims).

The parties provided no authority to establish that the U.C.C. applies to the construction contract at issue here, and this Court has identified no such authority. To the extent that the parties rely on provisions of the U.C.C. that Oregon courts have not applied to construction contracts, this Court declines to do so in the first instance.

### B. Conspicuousness

A limitation of liability provision is enforceable under Oregon law if the provision (1) was bargained for; (2) was called to the other party's attention; or (3) is conspicuous. *Anderson v. Ashland Rental, Inc.*, 122 Or. App. 508, 510 (1993); *Atlas Mut. Ins. v. Moore Dry Kiln*, 38 Or. App. 111, 114 (1979). Clearspan argues that the consequential damages waiver in the construction contract is enforceable because it is conspicuous. A term is conspicuous if it is written in a manner that "a reasonable person against which it is to operate ought to have noticed it." *Estey v. MacKenzie Eng'g, Inc.*, 137 Or. App. 1, 4 (1995), *rev'd on other grounds*, 324 Or.

372 (1996) (applying the U.C.C. definition of "conspicuous" to a case not governed by the U.C.C.). Whether a term is conspicuous is question of law. *Id.*

Plaintiff, in its response to Clearspan's motion, did not argue that the waiver is inconspicuous. It did, however, make that argument at oral argument. The Court need not consider arguments raised for the first time at oral argument. *BNSF Ry. Co. v. Or. Dep't Rev.*, 358 F. Supp. 3d 1129, 1143 (D. Or. 2018) (citing *In Re Pac. Pictures Corp.*, 679 F.3d 1121, 1130 (9th Cir. 2012)); *Mark v. Valley Ins. Co.*, 275 F. Supp. 2d 1307, 1309 n. 1 (D. Or. 2003) (exercising discretion not to consider arguments raised for the first time in a reply brief and inadequately briefed), *overruled on other grounds by Ashby v. Farmers Ins. Co. of Or.*, 143 F. App'x 55 (9th Cir. 2005) (mem.). Even so, Plaintiff's untimely argument lacks support. Contrary to Plaintiff's assertion at oral argument, the consequential damages waiver is conspicuous.

Plaintiff argued at oral argument that the consequential damages waiver is inconspicuous because it is "buried" in a forty-five-page contract. The construction contract consists of a cover page followed by just over seven pages of contract provisions.[2] Within those pages, the provisions of the contract are grouped into numbered Articles, which appear in bold, centered, capitalized letters. The consequential damages waiver appears in Article 7, which has the heading "INSURANCE TO PROTECT THE PROJECT AND WAIVER OF SUBROGATION." The consequential damages waiver in Section 7.4 is a numbered paragraph separated from surrounding numbered paragraphs by spaces above and below the paragraph. The consequential damages waiver begins with the heading "Mutual Waiver of Consequential Damages," which is

---

[2] Attached to the contract are thirty-seven pages of exhibits which, when added to the contract, total forty-five pages.

printed in bold typeface. The waiver follows that heading in plain typeface that is the same size as the other numbered paragraphs of the contract.

The consequential damages waiver in the construction contract is conspicuous because it appears in a brief, seven-page contract and is positioned and printed in a size and typeface that a reasonable person should have noticed. *Estey*, 137 Or. App. at 5 (holding that a limitation of liability clause that was not in boldface, capitalized, or offset with a separate heading, but also was "not hidden in the middle of a lengthy written agreement . . . [or] difficult to read or understand" was conspicuous); *Atlas Mut. Ins. Co. v. Moore Dry Kiln*, 38 Or. App. 111, 115 (1979) (provision was conspicuous because it was "not hidden in small print somewhere within a lengthy written agreement," was "located squarely in the middle of a one-page contract of sale," and was printed in boldface); *Nw. Pine Prods., Inc. v. Cummins Nw., Inc.*, 126 Or. App. 219, 222-23 (1994) (disclaimer was conspicuous as a matter of law because it was "set off from the surrounding text," "slightly separated from the paragraphs above and below it," and led by a caption in capitalized letters). Because the provision is conspicuous, it is enforceable as a matter of law unless it is unconscionable.

### C. Unconscionability

Plaintiff argues that the consequential damages waiver is unenforceable because it is unconscionable.[3] Oregon recognizes two types of unconscionability: procedural and substantive. *Bagley v. Mt. Bachelor*, 356 Or. 543, 555 (2014).

///

---

[3] In making that argument, Plaintiff relies on Oregon's adoption of U.C.C. § 2-719(2), which provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." O.R.S. 72.7190(3). Oregon courts have not applied that provision of the U.C.C. to construction contracts, so the Court analyzes Plaintiff's unconscionability argument under Oregon common law.

i.      *Procedural Unconscionability*

Procedural unconscionability examines the circumstances of formation of the contract and focuses on the existence of surprise and oppression during formation.  *Bagley*, 356 Or. at 555.  Oppression exists when there is an inequality of bargaining power that results in a party having "no real opportunity to negotiate the terms of the contract and the absence of meaningful choice."  *Id*.  Surprise occurs when terms are hidden from the party seeking to avoid their enforcement, such as when the terms are printed in fine print or ambiguous.  *Id*.

It is unclear to the Court whether Plaintiff argues that procedural unconscionability occurred in the formation of the construction contract.[4]  Plaintiff has produced no evidence to create a question of fact that the parties were of unequal bargaining power, Plaintiff had a lack of meaningful choice, or that the consequential damages waiver was hidden in a manner that caused surprise.  The waiver provision was mutual, and, as discussed above, was conspicuous.  Because Plaintiff produced no evidence to create a question of fact that the consequential damages waiver was the product of oppression or surprise, the Court finds that it is not procedurally unconscionable.

ii.      *Substantive Unconscionability*

Substantive unconscionability "focuses on the one-sided nature of the substantive terms" rather than formation.  *Id*. at 567 (internal quotation marks omitted).  The ultimate issue is whether the terms "contravene the public interest or public policy."  *Bagley*, 356 Or. at 555 (internal citations omitted).  Although procedural unconscionability is relevant to the overall

---

[4] Procedural unconscionability concerns the circumstances of formation.  Plaintiff claims that Clearspan's focus on conspicuousness at the time of formation "misses the boat" and argues that the Court should analyze unconscionability from the perspective of how the clause operates after a breach.

unconscionability analysis, substantive unconscionability is required for a court to invalidate a contract provision on unconscionability grounds. *Vasquez-Lopez*, 210 Or. App. at 567. Substantive unconscionability is analyzed on a case-by-case basis given the parties' respective bargaining power. *Motsinger v. Lithia Rose-FT, Inc.*, 211 Or. App. 610, 625 (2007). Unconscionability is question of law, and the party asserting unconscionability bears the burden of proving it. *W.L. May Co. v. Philco-Ford Corp.*, 273 Or. 701, 707 (1975).

The substantive unconscionability analysis "focuses on whether the substantive terms unfairly favor the party with greater bargaining power," *Hatkoff v. Portland Adventist Med. Ctr.*, 252 Or. App. 210, 217 (2012) (citations omitted), or are contrary to public policy, *Hinman v. Silver Star Grp., LLC*, 280 Or. App. 34, 41 (2016). To determine whether a contract term is unconscionable, the Court looks to the facts in existence when the contract was made. *Livingston v. Metro. Pediatrics, LLC*, 234 Or. App. 137, 151 (2010) (citing *Best v. United States Nat'l Bank*, 303 Or. 557, 560 (1987)). The Court assumes, based on the record and absent any argument or evidence to the contrary, that Plaintiff and Clearspan were business concerns of equal bargaining power. *Cf. K-Lines, Inc. v. Roberts Motor Co.*, 273 Or. 242, 252 (1975) (declining to find that the parties to the contract were of unequal bargaining power when the contract was for the purchase of five trucks for $93,000, and the other parties to the contract included a manufacturer and a distributor). The consequential damages waiver in the construction contract was mutual, and Plaintiff offered no argument that the mutual waiver contravenes the public interest or is contrary to public policy. In fact, Plaintiff relies on O.R.S. 72.7190(3), which expressly authorizes consequential damages waivers in contracts for the sale of goods, which reflects a public policy in favor of consequential damages waivers in that

context.  Because Plaintiff failed to meet its burden of proving unconscionability, the Court finds that the mutual waiver of consequential damages is not substantively unconscionable.

Although both parties base their unconscionability arguments on cases examining O.R.S. 72.7190, a U.C.C. provision, neither party provided authority to establish that O.R.S. 72.7190 applies to construction contracts.  Plaintiff's substantive unconscionability argument primarily relies on *Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide, LLC*, 35 F. Supp. 3d 1316 (D. Or. 2014).[5]  *Tokyo* involved a contract for the sale of chemicals.  Before signing the contract, the plaintiff, with the defendant's knowledge and cooperation, had extensively vetted the defendant's manufacturing process to ensure that the defendant manufactured the chemicals in a manner that ensured the level of quality required for the plaintiff's purposes.  The defendant knew that the plaintiff would rely on defendant to maintain that level of quality in the chemicals it provided to the plaintiff under the contract.  To that end, the contract required the defendant to give notice to the plaintiff of any changes it planned to make to the manufacturing process before implementing the changes.  The defendant breached the contract when it changed the manufacturing process without notifying the plaintiff, which led to a latent defect in the chemicals that went undetected during the plaintiff's quality control checks and caused the plaintiff to incur significant consequential damages when it resold the chemicals to its customers in breach of the plaintiff's contracts with those customers.  *Id*. at 1320-23.

The Court in *Tokyo* discussed that whether a consequential damages limitation is substantively unconscionable under O.R.S. 72.7190(3) depends on whether the provision operates in an unconscionable manner, which requires the Court to consider post-formation facts.

---

[5] However, in making that argument, Plaintiff sometimes cites the procedural unconscionability discussion in *Tokyo*.

*Id.* at 1337. The Court found that the provision operated in an unconscionable manner because the "knowledge and ability to avoid the harm caused by a change in the manufacturing process was solely [the defendant's,] and the parties did not expressly and consciously allocate that risk to [the plaintiff]" in the contract. *Id.* As a result, the Court found that it would be "fundamentally unfair to enforce the Limitation Clause." *Id.*

Plaintiff argues that the facts of *Tokyo* are similar to the facts of its case because, like the defendant in *Tokyo*, Clearspan seeks to enforce a consequential damages waiver when only Clearspan could prevent and avoid the consequential damages that would result from a breach. Plaintiff therefore argues that the consequential damages waiver provision is substantively unconscionable. The Court disagrees. The Court finds it dubious that *Tokyo* applies here because there is no indication that *Tokyo* applies to services contracts, and the standard for analyzing unconscionability in contracts for services differs from the standard that applies to contracts for the sale of goods since unconscionability in services contracts looks at the time of formation, and U.C.C. unconscionability looks at whether contract terms operate in an unconscionable manner after formation.

Further, the circumstances here are different from those in *Tokyo*. In *Tokyo*, the Court's finding that the consequential damages waiver was substantively unconscionable was based in part on the fact that the plaintiff had no way to detect the latent defects in the chemicals that the defendant sold it before the plaintiff, unaware of the defect, sold the chemicals to its customers and incurred significant consequential damages by breaching its contracts with its customers, which the plaintiff did not contemplate and bargain for when it signed the consequential damages waiver. Here, the defects in the construction of the greenhouse were not latent, did not go undetected, and did not cause J. Lilly to breach contracts with any third parties. As a result,

*Tokyo* does not establish that the consequential damages waiver at issue here is substantively unconscionable.

Plaintiff failed to meet its burden to demonstrate that the consequential damages waiver in the construction contract was unfairly one-sided or that enforcing it would contravene public policy.  As a result, it is not unconscionable, and the consequential damages waiver is enforceable.

> ### D.  Failure of Essential Purpose

Plaintiff argues that the remedies available to Plaintiff under the construction contract fail of their essential purpose under Oregon's adoption of U.C.C. § 2-719, which provides, in relevant part: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code . . . . Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." O.R.S. 72.7190(2)-(3).

To determine whether a limited or exclusive remedy fails of its essential purpose, "[t]he task before the district court [is] to examine the remedy provisions and determine whether [the defendant's] default caused a loss which was not part of the bargained-for allocation of risk." *Milgard Tempering, Inc. v. Seals Corp. of Am.*, 902 F.2d 703, 709 (9th Cir. 1990) (citations omitted).  The failure of a limited remedy to achieve its essential purpose does not automatically invalidate a consequential damages waiver provision.  *S.M. Wilson & Co. v. Smith Intern., Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978) (citations omitted).  Instead, whether a consequential damages waiver remains enforceable when a limited remedy fails to achieve its essential purpose it is a case by case analysis that is fact dependent.  *Id*. at 1375-76.  In holding that a

consequential damages waiver remained enforceable after it found that a limited repair remedy

failed to serve its essential purpose, the Court in *Smith* reasoned:

> Parties of relatively equal bargaining power negotiated an allocation of their risks
> of loss. Consequential damages were assigned to the buyer, Wilson. The machine
> was a complex piece of equipment designed for the buyer's purposes. The seller
> Smith did not ignore his obligation to repair; he simply was unable to perform it.
> This is not enough to require that the seller absorb losses the buyer plainly agreed
> to bear. Risk shifting is socially expensive and should not be undertaken in the
> absence of a good reason. An even better reason is required when to so shift is
> contrary to a contract freely negotiated. The default of the seller is not so total and
> fundamental as to require that its consequential damage limitation be expunged
> from the contract.

*Id*. at 1375.

At oral argument, the parties agreed that the construction contract is a contract for

services but asserted that the U.C.C. analysis for failure of a remedy's essential purpose applies.

Plaintiff and Clearspan cited no Oregon case that applied O.R.S. 72.7190 to a contract for

services. *Cf. RRX Indus., Inc.*, 772 F.2d at 546-47 (noting that the district court's decision to

award consequential damages under similar California U.C.C. provisions "was proper only if the

computer software system may be characterized as a good rather than a service.").

The only Oregon case on this topic cited by the parties involved a contract for the sale of

logging equipment. *Young v. Hessel Tractor & Equip. Co.*, 99 Or. App. 262, 782 P.2d 164

(1989). Ninth Circuit cases addressing the issue also involve contracts for the sale of goods.

*RRX Indus.*, 772 F.2d at 546 (computer software system); *Smith*, 587 F.2d 1363 (tunnel boring

machine); *Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1310 (dump truck parts);

*Milgard*, 902 F.2d at 705 (furnace); *Arias/Root Eng'g, Inc. v. Cincinnati Milacron Mktg. Co.*,

945 F.2d 408 (9th Cir. 1991) (machining centers). Consistent with those cases, cases in this

district have applied O.R.S. 72.7190 only to contracts for the sale of goods. *Tokyo*, 35 F. Supp.

3d at 1319 (chemicals); *Starr v. Dow Agrosciences LLC*, 339 F. Supp. 2d 1097 (D. Or. 2004)

(herbicide); *Agristor Credit Corp. v. Schmidlin*, 601 F. Supp. 1307, 1314 (D. Or. 1985) (cattle feeding equipment); *Saab Enters., Inc. v. Bruce Packing Co.*, No. CV-06-774-ST, 2007 WL 2746915, at *10 (D. Or. Sept. 19, 2007) (beef jerky) (holding that the failure of a remedy's essential purpose "applies to a clause that limits the available remedies," not a consequential damages waiver).

Even if the U.C.C. applies, Plaintiff identified no remedy provision in the construction contract that failed of its essential purpose. Plaintiff characterizes the consequential damages waiver itself as a remedy provision that fails of its essential purpose and argues that it fails because it operates to leave Plaintiff without a remedy and without the benefit of the bargain. According to Plaintiff, "the consequential damages waiver purports to limit J. Lilly's damages to the repair or replacement of the greenhouse, or to a refund of the cost of the greenhouse." Pl. Resp. Mot. Part. Sum. J. 9. But the consequential damages waiver—and the remainder of the construction contract—includes no such limitation of remedies. The consequential damages waiver precludes claims for consequential damages and nothing more. It limits no other contractual remedies that may be available to Plaintiff.

Because the consequential damages provision is a limitation of liability provision, not a remedy provision, O.R.S. 72.7190 does not apply unless the contract also has a limited or exclusive remedy provision. *See Saab Enters., Inc.*, 2007 WL 2746915, at *10 (noting that *Milgard*, *RRX Indus.*, and *Young* involved contracts with both a consequential damages waiver and a separate limited liability clause and holding that O.R.S. 72.7190 did not apply because the contract included a consequential damages liability waiver but no separate clause that limited remedies). Plaintiff identified no such limited or exclusive remedy provision. As a result, even if O.R.S. 72.7190 applied to construction contracts, the provision would be enforceable.

## II.      Whether Plaintiff's Evidence of Lost Profits is Too Speculative

Clearspan argues that the Court should preclude Plaintiff from seeking an award of lost profits at trial because Plaintiff has provided insufficient evidence on which a jury could determine the amount of Plaintiff's lost profits.  The Oregon Supreme Court has adopted the standard recited in Restatement of Contracts § 331, which requires that a Plaintiff must prove its lost profits with "reasonable certainty."  *Willamette Quarries, Inc. v. Wodtli*, 308 Or. 406, 412 (1989); *Douglas Constr. Corp. v. Mazama Timber Prods., Inc.*, 256 Or. 107, 112 (1970). Section 331 of the Restatement provides:

> (1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.
> (2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property.

*Douglas*, 256 Or. at 112.  A business can prove its lost profits with reasonable certainty by proving the amount of its past profits or, if the business has no past profits, with expert projections of its losses based on tests performed under substantially similar conditions.  *Id*.  A business cannot prove loss of future profits "merely by testimony of unverifiable expectations of profits."  *Id*. (internal citations and quotation marks omitted).

The plaintiff must present evidence that unambiguously refers to lost net profits, not gross profits, which necessarily requires the plaintiff to produce supporting data.  *Kwipco, Inc. v. Gen. Trailer Co.*, 267 Or. 184, 187 (1973); *Frogge v. United States W. Comm'ns, Inc.*, 120 Or. App. 619, 620 (1993) (per curiam) (affirming trial court's directed verdict for the defendant on the plaintiff's lost profits claim because the plaintiff's evidence "either refers expressly to lost *gross* profits or is ambiguous.").  The opinion of a business owner alone, without supporting data, is insufficient to prove net profits.  *Levene v. City of Salem*, 191 Or. 182, 201 (1951)

(business failed to prove lost profits with testimony of business owner about the business's lost profits because the testimony was "no more than pure speculation and conjecture, and it cannot support any judgment.").

However, "'reasonable certainty' is not a demanding standard—'reasonable probability is all that is required.'" *Peterson v. McCavic*, 249 Or. App. 343, 354 (2012) (quoting *City of Eugene v. Monaco*, 171 Or. App. 681, 688 (2000)); *Monaco*, 171 Or. App. at 688 (lack of absolute certainty does not preclude a party from submitting lost profits to the jury). The reasonable certainty standard serves to "screen out an issue from the jury when the court has concluded that the evidence, taken as a whole, is clearly insufficient to establish the fact sought to be proved." *Welch v. U.S. Bancorp*, 286 Or. 673, 704 (1979). Because Plaintiff was a new business with no past sales, it must prove its lost profits with expert testimony based on tests performed under substantially similar circumstances using specific data. *Willamette Quarries*, 308 Or. at 412. Plaintiff has not retained an expert to testify about its lost profits and produced insufficient data with which a jury could calculate Plaintiff's net lost profits.[6]

Plaintiff's owner, Frankie Powell, testified that her plan for J. Lilly was to sell the marijuana that J. Lilly produced to Mahalo, Inc., a marijuana dispensary owned by Powell, and then begin to focus on the genetics of the strains of marijuana that J. Lilly would grow and begin to sell to other dispensaries in Oregon. Ms. Powell had no experience growing marijuana, no formal business plan, and J. Lilly had no prospective clients other than Mahalo, Inc. when Powell started the business. Powell hired a person named "Brian" to consult with about the

---

[6] Plaintiff argues that it would be unfair to decide this motion now, without the benefit of Plaintiff's expert reports, which are unavailable because the parties agreed to extend the deadline to exchange expert reports. The parties' agreement to extend the exchange of expert reports does not affect this Court's resolution of this motion.

growing aspect of the business, but Brian did not have experience growing marijuana on a commercial scale, and Powell terminated him a month into his consultancy. Powell Dep. 24:20-22, 34:8-19. After Powell fired Brian, she consulted with another grower, Will Moseley, for a few months until she terminated him March 2018. *Id*. at 36:8-23, 61:20-24, 63:18-65:2. Powell and Moseley developed a plan in early 2018 for J. Lilly to begin growing marijuana plants under which Plaintiff would pay Moseley to provide clones and grow them in J. Lilly's greenhouse, but Moseley did not hold up his end of the deal. *Id*. at 63:13-64:25.

Powell estimated that Plaintiff would need to sell the output of 500-600 marijuana plants to make a profit. *Id*. at 149:1-4. The greenhouse Plaintiff leased from Clearspan would hold up to 900 plants, and Powell testified that each plant could produce one and a half to two pounds of marijuana per cycle. *Id*. at 65:11-66:5. Powell did not know how much of a profit that would have generated. *Id*. at 149:7-15. The record does not establish how many cycles Plaintiff planned to grow in a year. Powell did not know how much the costs to produce that amount of marijuana would be, because she planned to leave all of that up to the grower that she intended to hire. *Id*. at 149:16-17. When asked how she knew that J. Lilly would turn a profit, Powell testified that she had dedicated employees who knew what they were doing, and she knew in her heart that the right grower was out there to help her get plants growing in a perpetual cycle. *Id*. at 147:18-148:25.

As for clients, Powell outlined a marketing plan that would involve making a list of the marijuana dispensaries in the state and contacting them to build relationships from which to build a customer base for the business, but she did not carry out the plan beyond preparing the dispensary list. At the time of the alleged breach, no dispensaries other than Mahalo had agreed to purchase the marijuana that J. Lilly planned to produce. *Id*. at 70:13-71:21. Nothing in the

record demonstrates whether there was a market demand for the amount of marijuana that Plaintiff planned to produce. Plaintiff produced nothing beyond Powell's testimony to support its claim of lost profits.[7] Powell's testimony amounts to "unverifiable expectations of profits" that is insufficient to support Plaintiff's claim of lost profits. *Douglas*, 256 Or. at 112.

Plaintiff relies on *GPL Treatm't, Ltd. v. Louisiana-Pac. Corp.*, 133 Or. App. 633, 637 (1995) for the proposition that Plaintiff merely has to produce "some" evidence of its lost net profits to survive summary judgment. In that case, the Court of Appeals affirmed the trial court's ruling that a Chief Financial Officer's testimony and two exhibits he prepared were sufficient evidence to submit the question of lost profits to the jury. *Id*. at 638. The two exhibits the Chief Financial Officer had prepared calculated the company's lost profits using the company's costs and the sale price of the goods. *Id*. The Court of Appeals noted that there was "ample evidence from which the jury could [calculate the amount of lost profits], either by the use of the figures provided by [the plaintiff] or based on the market price, as argued by [the defendant]." *Id*. Powell's testimony is unsupported by any cost or sale price figures from which a jury could calculate any losses. As a result, its lost profits claim is too speculative to submit to a jury. *Douglas*, 256 Or. at 108-15 (rejecting contractor's lost profits claim because it failed to produce evidence of actual or estimated costs, previous profits, and evidence showed that weather would have impacted the project); *Buck v. Mueller*, 221 Or. 271, 279 (1960) ("If the business has not operated long enough to establish a reliable record of profits, the jury will not be

---

[7] Defendant Clearspan submitted Plaintiff's profit and loss statements for 2017 and 2018 which show that J. Jilly operated at a loss both years. Rigsby Supp. Decl. Ex. 1 at 1-2, ECF 52-1. The statements list amounts for various categories of expenses, including automobile, insurance, and office supplies, but those costs represent expenses during years that Plaintiff was not growing marijuana, not the costs that it would have incurred to make profits of $5,400,000. As a result, it is insufficient evidence from which a jury could calculate lost net profits.

permitted to speculate upon the probable success of the particular business alleged to have been harmed."); *Randles v. Nickum & Kelly Sand & Gravel Co.*, 169 Or. 284, 287-88 (1942) (contractor's testimony about lost profits was too speculative because "an award of damages for an alleged loss of profits by a contractor cannot be sustained where it is based upon 'mere estimate' as to the mount of the alleged profit, without 'supporting data,' and with 'no testimony that the plaintiffs had ever made a profit under similar contracts,' and in a business recognized to be 'highly speculative in its nature.'"). *See also Schafer v. Sunset Packing Co.*, 256 Or. 539, 545 (1970) (lost profits established with reasonable certainty by the owner's testimony that included the amounts of gross sales and expenses from which factfinder could calculate lost profits); *Westerlund v. Murphy Overseas USA Astorio Forest Prods., LLC*, No. 3:15-cv-1296-SI, 2018 WL 614710, at *11 (D. Or. Jan. 29, 2018) (holding that there was enough evidence to put the question of lost profits to a jury and emphasizing that the plaintiff had provided not only his own testimony in support of his lost profits claim, but he had also provided supporting data).

Given this precedent, Powell's testimony, which contained no amounts for gross sales, costs, or other supporting data is insufficient to submit the question of lost profits to a jury without expert projections based on tests performed under substantially similar conditions. Accordingly, the Court grants Clearspan's motion for summary judgment on this claim.

## III.     Illegality

The Court raised sua sponte the question of whether a federal court sitting in diversity can award a party lost profits generated from the sale of marijuana and ordered the parties to brief the issue. Having considered the parties' briefing, the Court concludes that it cannot award Plaintiff the lost profits it seeks. The Controlled Substances Act ("CSA") designates cannabinoids as a Schedule I controlled substance. 21 U.S.C. § 812. It is unlawful under the

CSA to "manufacture, distribute, or dispense" a controlled substance. 21 U.S.C. §§ 841(a)(1), 844(a) (penalties). The CSA criminalizes the manufacture, distribution, and possession of marijuana for any reason, including for purposes permitted by state law. *Gonzalez v. Raich*, 545 U.S. 1 (2005) (CSA applies to sale of medical marijuana permitted under state law). The Ninth Circuit has made clear that "[a]nyone in any state who possesses, distributes, or manufactures marijuana for medical or recreational purposes (or attempts or conspires to do so) is committing a federal crime" under the CSA, and the Supremacy Clause of the Constitution prohibits states from authorizing the manufacture, distribution, or possession of marijuana while it remains a Schedule I controlled substance under the CSA. *United States v. McIntosh*, 833 F.3d 1163, 1179 n. 5 (9th Cir. 2016). Plaintiff seeks compensation for profits that it would have earned from the manufacture, distribution, or dispensation of marijuana but for Defendants' breach of contract, breach of warranty, and negligence.

A federal district court may not enforce a contract if enforcing the contract would require a party to engage in conduct that is unlawful under federal statutes. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) (declining to enforce a contract that violated federal antitrust statutes); *Bassidji v. Goe*, 413 F.3d 928, 939-40 (9th Cir. 2005) (declining to enforce a contract that would have furthered trade with an Iranian company in violation of an executive order). In determining whether to enforce a contract, "courts should consider whether a remedy exists 'that would not require a court to order a legal violation.'" *Mann v. Gullickson*, No. 15-cv-03630-MEJ, 2016 WL 6473215, at *7 (N.D. Cal. Nov. 2, 2016) (quoting *Bassidji*, 413 F.3d at 939).

Under Oregon law, it is an affirmative defense to a breach of contract action that enforcing the contract would violate federal law. *Harold Butler Enters. No. 97, Inc. v. Vanlandingham*, 264 Or. 414, 424 (1973) (holding that affirmative defense of federal illegality

was available to the defendant in a contract action in state court when enforcing the contract would violate federal antitrust laws).  The extent to which an illegal contract is enforceable depends on whether the illegal terms are severable from the remaining terms.  *Montara Owners Ass'n v. La Noue Dev., LLC*, 357 Or. 333, 341 (2015) ("when an 'agreement is partly legal and partly illegal, if the legal may be separated from the illegal, the legal part will be enforced.'") (quoting *Eldridge v. Johnston*, 195 Or. 379, 405 (1952)); *State v. McDonnell*, 310 Or. 98, 116 (1990) (summarizing cases and concluding that "Oregon disregards the illegality and enforces the contract").  Even when illegal terms are not severable, Oregon courts will enforce the contract to the extent that it does not violate the law.  *Montara Owners Ass'n*, 357 Or. at 342 (holding that although illegal and legal terms were "intermingled," indemnification provision in a construction contract that was void as against public policy due to its overbreadth was enforceable to the extent allowed by statute).  Oregon courts, however, will not afford relief under state law if to do so would violate federal law.  *Emerald Steel Fabricators v. Bureau of Labor & Indus.*, 348 Or. 159, 186 (2010) ("whatever the wisdom of Congress's policy choice to categorize marijuana as a Schedule I drug, the Supremacy Clause requires that we respect that choice when, as in this case, state law stands as an obstacle to the accomplishment of the full purposes of the federal law.").

Other district courts in this circuit have declined to enforce contracts and award damages for the manufacture and sale of marijuana when no other remedy exists except one that would compel a party to violate the CSA.  *Bart St. III v. ACC Enters., LLC*, No. 2:17-cv-00083-GMN-VCF, 2018 WL 4682318, at *5 (D. Nev. Sept. 27, 2018) (enforcing terms of promissory notes securing loans for marijuana-related businesses that required the loan funds to be spent on legal acts and holding that contract provision requiring the use of funds for operating capital for

marijuana cultivation was unenforceable because it violated federal law); *Hemphill v. Liberty Mut. Ins. Co.*, No. 10-861 LH/RHS, 2013 WL 12123984, at *2 (D.N.M. Mar. 28, 2013) (granting summary judgment to defendant on ground that federal court sitting in diversity could not require insurance company to pay plaintiff's future medical expenses for medical marijuana use because to do so would violate federal law and policy); *Tracy v. USAA Cas. Ins. Co.*, No. 11-00487 LEK-KSC, 2012 WL 928186, at *13 (D. Haw. Mar. 16, 2012) (declining to order home insurer to pay for insured's claim for theft of marijuana plants because "Plaintiff's possession and cultivation of marijuana, even for State-authorized medical use, clearly violates federal law"). Conversely, courts will enforce a contract related to marijuana when enforcing the contract does not require a party to violate the CSA. *Mann*, 2016 WL 6473215, at *7-8 (denying the defendant's motion for summary judgment based on illegality because requiring defendant to pay amounts due under contract for the purchase of two websites would not require defendant to violate the CSA, even though websites contained information about how to cultivate marijuana).

This case is most analogous to *Tracy* and *Hemphill*. In *Tracy*, the defendant insurer provided homeowners' insurance to the plaintiff, who grew medical marijuana in the home and had all necessary licenses to comply with state law. The plaintiff sued her insurer for breach of contract when it refused to pay the plaintiff's insurance claim for the theft of several marijuana plants from the plaintiff's home, even though the policy covered loss to "trees, shrubs, and other plants." *Tracy*, 2012 WL 928186, at *1. The Court granted the defendant summary judgment because "[t]o require Defendant to pay insurance proceeds for the replacement of medical marijuana plants would be contrary to federal law and public policy." *Id.* at *13. Similarly, the Court in *Hemphill* concluded that it could not require an insurer to pay for the plaintiff's use of medical marijuana to treat injuries that she sustained in a car accident under a provision of an

insurance contract that required the insurer to pay the insured's future medical expenses. *Hemphill*, 2013 WL 12123984, at *2. It held that "even sitting in diversity, [the court] cannot force Defendant to recompense Plaintiff for medical expenses that are contrary to federal law and federal policy, even if the contract generally provides for the payment of future medical expenses." *Id.* Like the plaintiffs in *Tracy* and *Hemphill*, Plaintiff seeks a remedy that would require Defendant to pay Plaintiff for marijuana plants in violation of federal law and policy.

The parties' supplemental briefing drew the Court's attention to a case recently decided in this district concerning whether a plaintiff may claim lost profits from a cannabis business in a personal injury action. *Tarr v. USF Reddaway, Inc.*, No. 3:15-cv-02243-PK, 2018 WL 659859 (D. Or. Feb. 1, 2018). In that case, the Court denied summary judgment on the plaintiff's lost profits claim and held that the plaintiff could seek an award of lost profit damages derived from a cannabis growing business. *Id.* at *3. The Court's decision was based on the defendant's failure to cite any authority that precludes an injured party in a personal injury action from pursuing a claim for losses sustained by a cannabis operation when the operation is permitted by state law but illegal under federal law. *Id.* The Court's discussion in *Tarr* did not address whether awarding damages to the plaintiff would compel the defendant to violate the CSA and is thus inapposite to the Court's analysis in this case.

The Court is persuaded by the reasoning of the district courts in *Tracy* and *Hemphill* and finds that awarding Plaintiff damages for lost profits would require the Court to compel Defendants to violate the Controlled Substances Act. Accordingly, the CSA precludes this Court from awarding Plaintiff lost profits and provides an independent basis to dismiss Plaintiff's lost profits claim in addition to those discussed in sections I and II of this opinion.

///

## CONCLUSION

The consequential damages waiver in the construction agreement is enforceable and precludes Plaintiff from recovering consequential damages from Defendant Clearspan arising out of Clearspan's alleged breach of the construction contract. Plaintiff has failed to produce sufficient evidence in support of its lost profits claim. For those reasons, the Court dismisses Plaintiff's lost profits claim. The Court further finds that ordering Defendants to pay Plaintiff's lost profits claim would require Defendants to violate the Controlled Substances Act and dismisses Plaintiff's lost profits claim on that additional basis. Defendant Clearspan's motion for partial summary judgment [43] is GRANTED.

IT IS SO ORDERED.

DATED: _4/13/20_.

_____
MARCO A. HERNÁNDEZ
United States District Judge